DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT
_____

AMY JAEGER,

Petitioner,

v.

STATE OF FLORIDA,

Respondent.

No. 2D2024-1342
_____

February 12, 2025

Petition for Writ of Certiorari to the Circuit Court for Pinellas County;
Keith Meyer, Judge.

Sara Mollo, Public Defender; W. Randall Harper and Peter Chan,
Assistant Public Defenders, Clearwater, for Petitioner.

John M. Guard, Acting Attorney General, Tallahassee, and Tayna
Alexander, Assistant Attorney General, Tampa, for Respondent.

ROTHSTEIN-YOUAKIM, Judge.

Amy Jaeger petitions for a writ of certiorari quashing two
subpoenas seeking her medical records. We grant her petition and
quash the subpoenas.

The State has charged Jaeger with attempted murder in the first
degree, armed burglary, and aggravated assault on a law enforcement
officer. Within days of filing those charges, the State notified Jaeger that
it intended to serve a subpoena for medical records on Bayfront Medical
Center (where Jaeger was allegedly treated for injuries on the night of the

alleged crimes) and another on Sunstar EMS (the paramedics who allegedly transported Jaeger to Bayfront). The subpoena to Bayfront compelled production of Jaeger's records, "includ[ing] but not limited to: blood analysis, toxicology analysis, names of all treating physicians and nurses, and notes and observations of all treating physicians and nurses." The subpoena to Sunstar compelled production of Jaeger's records, including "all reports and notes to include names of all paramedics and rescue personnel; observations and notes." Jaeger objected, contending that the subpoenas were overbroad and that no nexus existed between the charges and the requested medical records.

At the hearing on Jaeger's objections, the State presented no testimony but relied exclusively for its evidentiary showing on the arrest affidavits underlying the charges against her. This much can be gleaned from those affidavits:

- Jaeger's boyfriend decided to break up with Jaeger based on her ongoing alcohol abuse.

- When Jaeger's boyfriend told Jaeger that the relationship was over, Jaeger stabbed him multiple times.

- Jaeger's boyfriend then fled to the home of a neighbor, who called 911.

- Still armed with the knife, Jaeger followed her boyfriend to the neighbor's home and attempted to break in by kicking through a door and then sticking her arm through that broken door to unlock it.

- Using a broken piece of wood, the neighbor fended Jaeger off until law enforcement deputies arrived.

- As one of the deputies repeatedly ordered Jaeger to stop, she began walking toward him, carrying the knife and yelling for him to kill her.

To support its contention at the hearing that the medical records likely contain relevant information, however, the State argued facts and possibilities beyond those supported by the affidavits. The State asserted

2

that the deputy had shot Jaeger several times, that she had sustained serious injuries from those shots, and that she had been taken to Bayfront for treatment. Further, the State suggested that Jaeger may have been injured by her boyfriend and that she may have made incriminating statements to the paramedics on her way to the hospital. The State argued, "[B]ecause the defendant received injuries in the case and was transported to the hospital, the state wants to ensure that the injuries received were not anything related to what the victim [the boyfriend] imposed on the defendant if there is a potential self-defense theory in the case." It also argued, "[B]ecause the victim did break up with the defendant because of her alcohol use, any information related to that is relevant to the case because that would go to show that the victim's reasoning and rationale was true that that was the reason the victim was breaking up with the defendant."

The trial court overruled Jaeger's objections and ordered that the subpoenas (narrowed to cover only the date of the incident) be allowed to issue, reasoning:

> [T]here's obviously a nexus between the defendant's blood chemistry as well as any physical injuries, as well as any statements that may have been made . . . . And the state is entitled to be prepared for a potential defense even if they haven't been formally raised at this time.

Jaeger contends that the subpoenas impermissibly invade her constitutional right to the privacy of her medical records. On the limited evidence that the trial court had at its disposal, we agree with Jaeger.

## Discussion

"Certiorari is the appropriate vehicle to review an interlocutory order requiring the production of confidential medical records." *Tyson v. State*, 114 So. 3d 443, 444–45 (Fla. 5th DCA 2013) (citing *Hunter v. State*, 639 So. 2d 72 (Fla. 5th DCA 1994)); *see also Faber v. State*, 157

3

So. 3d 429, 431 (Fla. 2d DCA 2015) (granting a certiorari petition where the trial court allowed disclosure of medical records in response to the State's request). We readily conclude that, if wrongful, disclosure of Jaeger's confidential medical records would cause irreparable harm that could not be remedied on appeal. *See Gomillion v. State*, 267 So. 3d 502, 506 (Fla. 2d DCA 2019). Accordingly, we have jurisdiction to consider whether the trial court's order authorizing service of the subpoenas departed from the essential requirements of law. *See id.* (citing *Montanez v. State*, 24 So. 3d 799, 801 (Fla. 2d DCA 2010)).

The guarantee in article I, section 23, of the Florida Constitution, that "[e]very natural person has the right to be let alone and free from governmental intrusion into the person's private life" extends to medical records. *State v. Rivers*, 787 So. 2d 952, 953 (Fla. 2d DCA 2001) (citing *Hunter*, 639 So. 2d at 74). To overcome a patient's privacy right in his or her medical records, the State must prove that it has a compelling interest in having the records disclosed. *Id.* "Such an interest exists where there is a reasonable founded suspicion that the materials contain information relevant to an ongoing criminal investigation." *Id.* (first citing *Hunter*, 639 So. 2d at 74; and then citing *State v. Rutherford*, 707 So. 2d 1129, 1131 (Fla. 4th DCA 1997)).

Applying that test, we have required that the State "show a 'nexus' between the medical records the State seeks and some material issue in the case by (1) identifying some theory that reasonably makes the records relevant and (2) producing some evidence that makes it reasonable to expect that the records will produce evidence that supports the theory." *Gomillion*, 267 So. 3d at 507; *see also Cerroni v. State*, 823 So. 2d 150, 152 (Fla. 5th DCA 2002) ("[T]he state has the obligation and

4

burden to demonstrate relevancy, *via evidence*, before the subpoena may issue." (emphasis added)).

To be sure, the State generally may rely on arrest affidavits as "evidence" in this context, *see McAlevy v. State*, 947 So. 2d 525, 530 (Fla. 4th DCA 2006) (concluding that the lower court did not err in relying on the State's probable cause affidavit), but there is a mismatch here between the State's relevance arguments at the hearing and the information that is actually included in the affidavits. Those affidavits say nothing about any injury or threat of injury to Jaeger by the victim, so the State's professed concern about "a potential self-defense theory" appears baseless.[1] Nor do they support even an inference that Jaeger made incriminating statements to responding paramedics. That she may have done so was pure speculation—hardly a sufficient basis to violate her constitutional right to the privacy of her medical records—and in any event, the Sunstar subpoena was not limited to her statements. *Cf. Rodriguez v. State*, 308 So. 3d 1018, 1020 (Fla. 4th DCA 2020) (noting that the State had presented no evidence suggesting that the defendant had "made any statements to medical personnel about how the crash happened"). Finally, the State has neither attempted to identify *particular* elements of any of the State's charges for which the medical records may be relevant in whole or in part, nor has it proved that the requested documents may include information relevant to those discrete elements.[2] *See Tyson*, 114 So. 3d at 445 (holding that the State failed to

---

[1] We note that at least as of the time of the hearing, Jaeger had not filed any Stand Your Ground motion under section 776.032, Florida Statutes (2023), and she conceded, "If we end up pursuing the self-defense claim, that's an affirmative defense and we would have to disclose those records that we would be intending to use."

[2] The State has not charged Jaeger with driving under the influence or with any other offense that makes intrinsically relevant her alcohol

demonstrate relevance of defendant's medical records given that the records were unrelated to any element of the charged offense, defendant did not engage in reciprocal discovery, and defendant was not relying on any mental health defenses such as insanity); *see also Gomillion*, 267 So. 3d at 507 (concluding that the State did not prove that defendant's toxicology records were relevant to any element of the charged offenses or to any defense that could be raised by the defendant).

 Accordingly, the trial court departed from the essential requirements of law when it authorized the issuance of the subpoenas for Jaeger's medical records. Having already concluded that the wrongful disclosure of the records would cause irreparable harm for which Jaeger has no adequate remedy on appeal, we grant her petition and quash the subpoenas. Nothing in this disposition, however, prevents the State from seeking to subpoena Jaeger's medical records in the future if it makes the required showing.

 Petition granted; order quashed.

VILLANTI and LUCAS, JJ., Concur.

————————————————

Opinion subject to revision prior to official publication.

————————————

consumption on the day of the incident. Even if we were to accept the dubious proposition that the State has a compelling interest in obtaining medical records to enhance its storyline at trial (i.e., by bolstering the victim's claim that he ended his relationship with Jaeger because she chronically abused alcohol), that rationale still would not justify a subpoena to the paramedics and would at best support only a more narrowly tailored subpoena to the hospital. *Cf. Faber*, 157 So. 3d at 431 ("While certain aspects of those [medical] records are potentially relevant to his mental state and actions at the time of the murder—especially if notices related to anticipated defenses or sentencing mitigators are eventually filed—it is unlikely that all of his VA records are relevant.").